**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**


NEW MEXICO CATTLE GROWERS
ASSOCIATION, et al.,

        Plaintiffs,

vs.                                                                CIV No. 98-367M/JHG

UNITED STATES FISH AND WILDLIFE
SERVICE, et al.,

        Defendants,

and

DEFENDERS OF WILDLIFE, et al.,

        Defendant-Intervenors.


## <u>MEMORANDUM OPINION AND ORDER</u>

This case arises from a decision to release Mexican gray wolves bred and raised in captivity into five thousand acres of national forest land located in Arizona and New Mexico. Listed as an endangered species in 1976, the Mexican wolf was found prior to that time in the Southwestern part of the United States. As a result of commercial and recreational hunting and trapping, fears for human safety, concerted efforts to protect livestock and government eradication policies, the Mexican wolf was eliminated from its natural habitats and has survived since only through a captive breeding program. Now the United States has changed its course. As part of a conservation program mandated

by the Endangered Species Act, the United States Fish and Wildlife Service plans to reintroduce the Mexican wolf into some of its original territory, and by a managed release of wolves raised in captivity, the Fish and Wildlife Service expects to establish a viable and self-sustaining Mexican wolf population in the wild.

Plaintiffs strongly protest reintroduction of wolves into Arizona and New Mexico. Plaintiffs are owners of livestock who live, work and recreate in and near the areas where wolf releases are taking place. They contend (1) that the decision to reintroduce the Mexican wolf into Arizona and New Mexico violates the National Environmental Policy Act (NEPA), 42 U.S.C. sec.4321 *et seq.*, because the mandatory Final Environmental Impact Statement (FEIS) is legally insufficient; (2) that the releases violate the Endangered Species Act (ESA), 16 U.S.C. sec.1536, *et seq.*; and (3) that, as an arbitrary and capricious decision, the release of wolves into the region violates the Administrative Procedures Act (APA), 5 U.S.C. sec.701 *et seq.* First, Plaintiffs seek a judgment which would declare the decision to release wolves unlawful and invalidate Defendants' Final Rule authorizing releases. Secondly, Plaintiffs request an injunction permanently precluding Defendants from releasing Mexican wolves in Arizona and New Mexico.

Initially, Plaintiffs requested issuance of a preliminary injunction to stop wolf releases at the earliest possible time. The matter was referred to a magistrate judge and extensive briefing was completed. However, because the parties asked for several extensions of time in order to prepare their briefs, at the point briefs were finally completed and the magistrate judge was ready to hold a hearing on Plaintiffs' Motion for a Preliminary Injunction, the case was ripe for a ruling on the merits. For this reason, the magistrate judge was informed he need not rule on the preliminary injunction and no determination was entered.

I have thoroughly considered all of Plaintiffs' arguments, including the request for an injunction, and I have reviewed the entire administrative record underlying Defendants' decision and the statutes and regulations which authorize and direct a wolf recovery program. The scope of my review does not allow me to substitute my judgment for that of the Defendants, but only to determine whether in implementing plans and formulating policies for its wolf recovery program, Defendants weighed all pertinent facts, complied with applicable law and made rational choices. <u>Olenhouse v. Commodity Credit Corporation</u>, 42 F.3d 1560 (10th Cir. 1994).

I find and conclude that Defendants' challenged decisions are within the scope of their authority, that the choices made and the procedures utilized comply with what the law requires, and that the administrative record demonstrates a rational decision-making process. Therefore, I deny Plaintiffs the relief they request and enter judgment for Defendants.

The Parties

Plaintiffs, New Mexico Cattle Growers Association, New Mexico Public Lands Council, Grant County Farm and Livestock Bureau, Catron County Livestock Bureau, New Mexico Wool Growers, Inc., New Mexico Farm and Livestock Bureau, Hidalgo County Cattle Growers, and Greenlee County Cattle Growers are nonprofit membership organizations. Together with Plaintiff Production Credit Association, an association formed pursuant to the Farm Credit Act of 1971 to promote the cattle industry, these organizations represent approximately 10,000 individuals who reside, farm, ranch, hunt, fish and recreate near or within the areas where the Fish and Wildlife Service (FWS) has released Mexican wolves or within the areas where it is anticipated the newly introduced wolves will eventually disperse.

Defendant Bruce Babbitt is Secretary of the United States Department of the Interior.

Defendant Jeff Haskett is the Acting Director of the Fish and Wildlife Service (FWS), an agency within the Department of the Interior. Defendant Nancy Kaufman is Director of FWS for the Southwest Region. These individuals are charged with implementing the statutory and regulatory requirements of NEPA, the ESA, and the APA; and as part of their official responsibilities, these individuals issued a Final Environmental Impact Statement, a record of deci-sion and a Final Rule implementing a recovery program for the Mexican gray wolf and authorizing release of wolves into parts of Arizona and New Mexico.

The case also includes additional Defendants who have been permitted to intervene. The Defendant-Intervenors are Defenders of Wildlife, the National Parks and Conservation Association, the Mexican Wolf Coalition of Texas, Preserve Arizona's Wolves, the Southwest Center for Biological Diversity, the White Sands Wolf Coalition, Sky Island Alliance, Wildlife Damage Review, the National Wildlife Federation, Arizona League of Conservation Voters, Forest Guardians, Sierra Club (Rio Grande Chapter), and Animal Protection of New Mexico, Inc., all nonprofit organizations who advocate on behalf of their members and the protection of animals and plants, and Jeff Williamson, an individual and resident of Arizona who engages in outdoor activities in the wolf recovery area. The Memorandum Opinion and Order entered in this case on December 12, 1998, recognized that the Defendant-Intervenors have committed themselves to preservation of the Mexican wolf, have participated in every aspect of the wolf recovery debate, and have provided the public with meaningful educational information and other programs about the wolf and Defendants' wolf recovery plan.

<u>Factual Background</u>

Since the early1970's, the Mexican wolf (*Canis lupus baileyi*) has no longer inhabited the

American Southwest. The smallest and most easily distinguished subspecies of the gray wolf, the Mexican wolf once ranged from central Mexico northward through southeastern Arizona, southern New Mexico and southwestern Texas. Beginning in the 1870s, bounties were offered for these wolves, in large part because they were infamous killers of livestock, and by the 1920s, the population of the Mexican wolf had been severely reduced in all parts of its original range. For at least the last twenty years, the Mexican gray wolf has been considered completely extirpated from the Western United States.

Wolves originally ranged throughout most of North America north of Mexico City. The red wolf inhabited the southeastern United States and the gray wolf the remainder of the continent. Wolves were completely eradicated from entire regions, such as the greater Yellowstone area and parts of the Southeast, as early as the 1930s. The gray wolf now resides principally in Canada, with limited numbers occurring naturally in Minnesota, Michigan and Wisconsin. It is said to live in the wild in Mexico, but its existence and numbers there remain unconfirmed. In addition to the Mexican wolf, other subspecies of the gray wolf include the eastern timber wolf, the Canadian wolf and the northern Rocky Mountain wolf (although the latter is not universally accepted as a separate subspecies).

According to FWS, the gray wolf is one of the rarest land mammals in the world. Their large-scale extermination resulted from a combination of events which included alterations to habitat, concerted federal eradication efforts requiring removal of wolves from all public lands, and pro-longed intentional killing (widespread use of poisons, shooting to protect domestic livestock, and commercial and recreational hunting and trapping). Pursuant to the Endangered Species Act, the *Canis lupus baileyi* was declared endangered in 1976. 50 C.F.R. sec.17.ll. The gray wolf remains

an endangered species throughout the contiguous 48 states except for Minnesota, where it is classified as threatened.

Revised national policies have moved from extermination of the wolf to saving it from extinction. Since passage of the Endangered Species Act, the Department of the Interior, through agencies such as the National Park Service, the Forest Service and the Fish and Wildlife Service, has actively engaged in planning wolf recovery and in finding suitable areas to reestablish wolf populations in the wild. In the interim, the Mexican wolf has survived only by means of a captive breeding program. In1977, the program, led principally by FWS, was responsible for 148 captive wolves held at 25 facilities in the United States and five locations in Mexico. Neither this number nor a captive environment, however, is considered sufficient to insure survival of the species; and the Secretary of the Department of the Interior is obligated by the ESA to attempt recovery of the Mexican wolf in its "historic" habitat, as best an appropriate habitat can be determined and protected. 16 U.S.C. sec. 1533(f);  Forest Guardians v. Babbitt, 174 F.3d 1178 (10th Cir. 1999).

Entities other than the United States government are also responsible for the conservation of plants and animals threatened with extinction. In addition to efforts by the Department of the Interior directed by the ESA, both the State of New Mexico and the State of Arizona have statutory requirements which mandate the listing and protecting of endangered species. The Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere, a treaty signed by the United States and Mexico in 1942, provides for preservation in natural habitats of "all species and genera" of the flora and fauna which are native to both countries.

FWS, working with others agencies and organizations, completed a recovery plan for the Mexican gray wolf in 1982. A recovery plan consists of conservation strategies and guidelines for

restoring a threatened or endangered species in portions of its former range. The Mexican wolf recovery plan constitutes the third effort by FWS to restore a wolf population in the wild. FWS released 71 captive-bred red wolves in northeastern North Carolina in 1987, and beginning in 1991, it has released 37 red wolves in Tennessee. In 1995 and 1996, 66 gray wolves were released into Yellowstone National Park and central Idaho. Reintroduced red wolves are surviving well, and the current wolf population in Yellowstone and Idaho is approximately 160.

The Mexican wolf recovery plan calls for both a captive breeding program and establishment of a viable, self-sustaining population of approximately 100 wolves within a 5,000 square mile area of Arizona and New Mexico. The area currently designated for recovery of the Mexican wolf is com- prised principally of national forest land and is said to have constituted part of the species' original habitat. A self-sustaining wolf population in this area is to be achieved by controlled releases of captive wolves over a five-year period. Controversial from its inception, the Mexican wolf recovery plan has met with constant local animosity. This hostility ranges from protests of farmers and ranchers to threats against individual wolves to official statements of the New Mexico Department of Agriculture. The recovery plan has nevertheless proceeded at a fairly constant rate for several years, and to this point three releases of captive-bred Mexican wolves have taken place in Arizona.

The Mexican wolf captive population originated between 1977 and 1980 with five wolves caught in the wild between Durango, Colorado and northern sections of Mexico. Three of these first five wolves produced offspring in captivity, and later, additional wolves were added to the original group. While opponents of the wolf recovery plan question the genetic makeup of these wolves, FWS believes them to be solely of the species *Canis lupus baileyi,* and not, as some insist, hybrid wolves with a genetic history that includes substantial intermingling with dogs and coyotes.

The Mexican gray wolf is highly social. It lives in small packs of related individuals. It tends to roam long distances, but by howling, maintains identifiable territories. FWS thus anticipates releasing wolves in groups, eventually releasing 14 or 15 family groups, all from the captive population. The Mexican wolf has not been studied to the extent of other subspecies, but it is expected that released wolves will live and travel in packs of two to eight animals. The areas designated for release contain large, remote expanses of federally-managed land, and captive wolves selected for release will be allowed to disperse freely throughout the range.

According to the recovery methods adopted, wolves are chosen for release from the captive population by a variety of factors. Prior to release, the selected wolves are to be moved to a temporary facility in the Sevilleta National Wildlife Refuge in central New Mexico, where they are to be held for an adjustment period of approximately six months, paired for compatibility, oriented to their native prey, and prepared for life in the wild. Adult wolves are inclined to move over wide areas, and in addition to other purposes, use of a temporary facility and initially restricted movement is an attempt to increase affinity to the recovery area and disrupt roaming tendencies. Prior to release, adult-sized wolves are given a radio collar for monitoring purposes, and each wolf is permanently marked for identification, tracking and possible recapture.

Releases are to take place only in predetermined regions of Arizona and New Mexico which have been designated as "wolf recovery areas." These locations have been declared part of the "probable historic range" of the Mexican gray wolf. 50 C.F.R. sec. 17.84(k)(2). The habitat of the Mexican wolf, as projected by wolf experts, most likely included forested, mountainous terrain northward from the Gila River and eastward into western Texas, with wide extensions to the North and Northwest into large parts of Arizona and New Mexico. Again, because the Mexican wolf is

capable of dispersing hundreds of miles, an historic habitat cannot be designated with certainty.

  While purportedly directed by legal requirements that the species be returned to a historic habitat, selection of recovery sites was largely dictated by available ecological resources and the needs of a wild wolf population. In addition to estimating original habitats, then, designating wolf recovery areas necessarily depended on considerations of topography, the availability of water, the nature of vegetation in the area and the accessibility of a prey base capable of supporting up to 100 reintroduced wolves. Beyond these factors, FWS also considered the location of other large predators, such as the mountain lion, cougar, bear and coyote, the level of human or other disturbances common to the area (including hunting seasons), livestock density and anticipated livestock depredation, and opportunities for managing livestock depredation. With historic and biological data on free-ranging wolves in the Southwest scare, analysis of site selection factors was necessarily undertaken by qualitative projections rather than by use of historically-collected factual data.

  The major portion of the recovery area eventually selected is known as the Blue Range Wolf Recovery Area. It consists of all of the Apache National Forest located in east-central Arizona, all of the Gila National Forest in west-central New Mexico, and additional areas in New Mexico which extend North almost to Quemado, South to the San Francisco River and West through Catron County and into Sierra County. 50 C.F.R. sec. 17.84(k)(9)(i). The Apache National Forest, bounded on the east by the Arizona-New Mexico state line and on the West by the San Carlos Apache Reservation, has been designated a "primary recovery zone" where initial releases are to take place. Id. After the initial releases, the wolf population will be allowed to disperse into the remainder of the Blue Range Wolf Recovery Area. Id.

  A second recovery area, designated the White Sands Wolf Recovery Area, is located in south-

central New Mexico. This area includes all of the White Sands Missile Range, the White Sands National Monument, the San Andres National Wildlife Refuge and the area adjacent and to the West of the White Sands Missile Range. The area is bounded on the North by the Sierra-Socorro County line. 50 C.F.R. sec. 17.84(k)(9)(ii). This second area is a "back-up" which will be used only if "necessary and feasible" to reach the projected goal of 100 Mexican wolves established in the wild within five years. Id.

Wolves released in either recovery area are to be managed, maintained and protected as a "nonessential, experimental" population. If done to "further the conservation of the species," the Secretary of the Department of the Interior is authorized to designate a population of endangered or threatened species as "experimental," and afterwards to release the population into suitable natural habitat which is outside the species' current natural range, but within its probable historic range. 50 C.F.R. sec. 17.81; 16 U.S.C. sec. 1539(j)(2)(A).

"Experimental population" means a designated population, including subsequent off-spring, which can be introduced into an area where it is "wholly separate geographically from nonexperimental populations of the same species." 50 C.F.R. sec.17.80(a). When a species is designated "experimental," it is treated as if it were listed as a threatened species, rather than an endangered one. 50 C.F.R. sec.17.82. The term *essential experimental population* means an experimental population whose loss would appreciably reduce the likelihood of the species' survival in the wild. 50 C.F.R. sec.17.80(b). "All other experimental populations are to be classified as *nonessential.*" Id. The designation "nonessential" also means that the Blue Range Wolf Recovery Area is not regulated or protected as a "critical habitat." 50 C.F.R. sec. 17.81(f). (Even though a declaration that a species is "endangered" ordinarily triggers ESA requirements for designation and protection of the species'

critical habitat, 16 U.S.C. sec. 1533(b)(6)(C), no critical habitat designation is made when a species is termed a nonessential population. 16 U.S.C. sec.1539(j)(2)(C); 50 C.F.R. sec.17.81(f).)

Usual prohibitions against the taking of endangered species have been modified for the wolf recovery program. The non-negligent, unavoidable and unintentional killing of Mexican wolves, occurring incidentally to legal activity, is not unlawful. 50 C.F.R. sec.17.84(k)(3)(i). In addition, "livestock producers" (defined as producers of cattle, sheep, horses, mules or other animals) are permitted to kill or injure wolves who are found on private land in the act of killing, wounding or biting livestock. 50 C.F.R. sec.17.84(k)(3)(ii). Although FWS provisions do not permit the wolf to be purposely "attracted, tracked, waited for or searched out," livestock producers who are legally using public land, landowners on their own private land and persons on tribal land may harass wolves in a noninjurious manner. 50 C.F.R. sec.17.84(k)(3)(i). Harassing means to act either intentionally or negligently to annoy the animal in a non-lethal manner to such an extent as to significantly disrupt normal behavioral patterns such as breeding, feeding, or sheltering.  50 C.F.R. sec. 17.84(k)(15). When the activities are non-lethal, persons are permitted to harass wolves that are "within 500 yards of people, buildings, facilities, pets, livestock. . . . or other domestic animals." 50 C.F.R. sec. 17.84(k)(3)(ii). FWS regulations also provide for dealing with "problem" wolves by relocation or lethal measures. "Problem" wolves are those that prey on livestock or domestic animals, are members of a pack or group directly involved in depredations, or have become habituated to humans, residences, or other facilities. 50 C.F.R. sec. 17.84(k)(3) and (k)(15).

In anticipation of releasing captive wolves, FWS issued a draft environmental impact statement; and in November 1996, it issued a Final Environmental Impact Statement (FEIS). The latter was followed by a Final Rule and a formal record of the administrative decision. On January 12, 1998,

the Final Rule was published in the Federal Register as a completed agency decision, and after publication, FWS began to release wolves into the designated areas.

By their claims grounded in NEPA, the ESA, and the APA, Plaintiffs seek to invalidate the FWS decision to launch and support a wolf recovery program and to preclude any further releases. Stating that their members use both public and private land within the recovery area for farms, ranches and residences, as well as for livestock grazing, hunting, fishing, recreation and aesthetic purposes, Plaintiffs allege that FWS decisions, as expressed by its Final Rule, (a) are arbitrary and capricious, (b) represent an abuse of discretion, and (c) constitute multiple violations of the statutes at issue. Plaintiffs contend that the FWS program directly threatens their members with irreparable injury from the many changes likely to result from reintroduction of wolves into the designated area.

While Plaintiffs and Defendants agree that the wolf is a significant predator, Plaintiffs claim it is highly likely to kill cattle, sheep and other domestic livestock in much larger numbers and with a much greater frequency than FWS anticipates or acknowledges. Plaintiffs point out that the Mexican wolf is capable of traveling great distances, that it is likely to be uncontrolled on public lands and that it can be expected to roam onto Plaintiffs' members' private property. Plaintiffs con-tend that introduction of the Mexican gray wolf into its former habitat will likely result in a shift in animal populations in the area, in significant loss of livestock, in land-use restrictions and in the possible taking of private property.

These challenges put FWS decisions--or more precisely, the FWS decision-making process– at issue, and as a general rule, administrative actions which constitute a "final agency action" are subject to judicial review. 5 U.S.C. sec. 702. All parties agree that Defendants' published Final Rule and initiation of the FWS wolf recovery program constitute "final agency action." The exceptions to

reviewability are only two: where there is a statutory prohibition or where agency action is committed to the agency's discretion as a matter of law. 5 U.S.C. sec. 701(a)(1), 701(2)(2). Neither of these exceptions is a concern in this case.

<u>Standing to Sue</u>

Whether it be the APA or some other avenue which grants Plaintiffs access to judicial review, a statutory right of action by itself does not confer jurisdiction on a district court. Plaintiffs must first establish standing to sue. <u>Committee to Save the Rio Hondo v. Lucero</u>, 102 F.3d 445 (10th Cir.1996). Standing is a prerequisite to jurisdiction. <u>Mount Evans Company v. Madigan</u>, 14 F.3d 1444, 1449 (10th Cir.1994).

Article III of the United States Constitution demands that the judicial branch be limited to cases and controversies, and standing is initially considered as a constitutional requirement intended to ensure that a litigant has a "direct stake in the outcome" of the litigation. <u>Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.</u>, 454 U.S. 464, 473 (1982). This Constitutional requirement is an explicit limitation on the power of the federal courts to adjudicate or resolve conflicts. <u>Id</u>. As such, it is absolute and immutable. <u>Bennett v. Spear</u>, 520 U.S. 154, 162 (1997).

> Article III of the Constitution requires a plaintiff to show: (1) he or she has personally suffered an injury in fact; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision. . . . <u>Mount Evans Company v.Madigan</u>, <u>supra</u> at 1450.

Where standing is established, decisions of a federal administrative agency are presumptively reviewable. 5 U.S.C. sec. 702. As a minimum, however, a plaintiff bears the burden "of

establishing an actual or imminent injury that is concrete and particularized rather than conjectural or hypothetical,' a causal connection that is 'fairly traceable' to the conduct complained of,' and a likelihood of redressability in the event of a favorable decision." Catron County Board of Commissioners v. United States Fish and Wildlife Service, 75 F.3d 1429, 1432 (10th Cir.1996), citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992); Valley Forge College v. Americans United, supra at 472. "To fully establish injury in fact, a plaintiff must be able to show that a separate injury to its concrete, particularized interests flows form the agency's procedural failure." Lujan v. Defenders of Wildlife, supra at 572.

After a plaintiff demonstrates constitutional standing, courts do not exercise jurisdiction until standing is examined a second time according to judicially-imposed "prudential" standards. As court-imposed limitations on the exercise of judicial power, prudential standing requirements demand "that a plaintiff's grievances must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bennett v.Spear, supra at 162. Prudential standing requirements primarily refer to what is called a "zone of interest" test which turns essentially on the inquiry "whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law." Mount Evans Company v.Madigan, supra at 1451. Although a mandatory standard, this test is not meant to be a demanding one, and plaintiffs need not demonstrate an indication of congressional purpose to benefit them in particular. Clarke v. Securities Industry Assoc., 479 U.S. 388, 401 (1987).

> Beyond the constitutional requirements, a plaintiff must also satisfy the following set of prudential principles: (1) plaintiff generally must assert his or her own legal rights; (2) the court must refrain from adjudicating "generalized grievances" most appropriately addressed by one of the

other branches of government; and (3) the plaintiff's complaint must fall within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question. <u>Mount Evans Company v.Madigan</u>, <u>supra</u> at 1450.

All of the same elements apply when the plaintiff is an association. <u>Warth v. Seldin</u>, 422 U.S. 490, 511 ( 1975). Associational plaintiffs also must meet both constitutional and prudential standing requirements.

> An association has standing to sue even if it has not been injured itself so long as the association's members satisfy the constitutional minimum of Article III. An association has standing to bring suit on behalf of its member when: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.' <u>Committee to Save the Rio Hondo v. Lucero</u>, <u>supra</u> at fn. 3, citing <u>Hunt v. Washington State Apple Advertising Commission</u>, 432 U.S. 333, 343 (1977).

In determining whether an organization or association has standing, the Supreme Court has recognized aesthetic, environmental and economic harm as injuries in fact, so long as the challenged action can be shown to cause the injuries alleged and the plaintiff asserts a "specific and perceptible" harm which distinguishes the interests of the organizational plaintiff and its its members from the generalized interests of the public as a whole. <u>Sierra Club v. Morton</u>, 405 U.S. 727 (1972); <u>United States v.SCRAP</u>, 412 U.S. 669 (1973).

<u>Plaintiffs' Standing</u>

In the present case, there are no material facts in dispute with regard to issues of standing. Plaintiffs state in the First Amended Complaint that their members reside, farm, ranch, hunt, fish, and recreate in the areas designated for wolf recovery, that their members graze livestock in these areas,

and that Plaintiffs' members also use private, state and federal lands within the area for aesthetic purposes. Plaintiffs assert that the reintroduction of wolves into the region jeopardizes all of their members' customary uses of the land and environment near and within the wolf recovery area, threatens other endangered animals and plants, imperils the life and well-being of cattle, sheep and other domestic livestock belonging to Plaintiffs' members, and inalterably changes the area's total environment to an extent neither acknowledged nor adequately evaluated by FWS.

Neither the federal Defendants nor the Defendant-Intervenors attack Plaintiffs' assertions made in support of standing to sue. Defendants contest none of Plaintiffs' statements that their membership uses public and private land in the wolf recovery area for residential, business, recreational and aesthetic purposes. The federal Defendants state in their Answer to the First Amended Complaint that they "lack knowledge or information sufficient to form a belief" regarding the truth of these statements, and Defendants deny only Plaintiffs' conclusions that they or their members have suffered injury and that FWS has not considered the full scope of environmental issues or made a rational decision. Defendant-Intervenors have not filed an Answer and I assume they adopt or rely on the Answer of the federal Defendants.

Defendants plead lack of standing as an affirmative defense, but again, Defendants accept the underlying facts as averred by Plaintiffs. Defendants propose no separate statement of facts to support their affirmative defense nor do they place the Plaintiffs' allegations in dispute. Defendants premise their affirmative defense on the conclusion that the facts as stated are legally insufficient to confer standing. In subsequent documents and briefs, as well, Defendants accept all factual allega-tions regarding the geographic proximity of Plaintiffs' members to the wolf recovery area and their residential, business, recreational and aesthetic use of the land and environment.

The uncontested facts include:

a. Plaintiffs' members' ownership of farms and ranches in the geographical area of the wolf recovery program and the members' permanent residence on these farms and ranches,

b. Plaintiffs' members' use of the wolf recovery area for hunting, fishing, recreation and grazing of domestic livestock (defined as cattle, sheep, horses, mules and other animals), as well as members' aesthetic use and appreciation of the land in and near the recovery area,

c. the migratory nature of the Mexican gray wolf,

d. the ability of wolves, once released into the wild, to roam freely in the wolf recovery area and areas adjacent to it, and the inability to predict or control where the wolves will travel,

e. the predatory nature of the Mexican gray wolf and its killing in the past of deer, elk and domestic livestock,

f. inability to predict with certainty the amount of domestic livestock likely to be killed by wolves released in or near the livestock's current locations,

g. difficulty in distinguishing pure Mexican gray wolves from hybrid wolves and dogs in the wild,

h. a growing number of wolves in designated parts of Arizona and New Mexico and the intent of the FWS recovery program to increase the number of wolves in designated areas until they are a self-sustaining species of approximately 100, and

i. inability to predict the effect of a new wolf population on other species of animals and on plants in and surrounding the wolf recovery area.

While Plaintiffs recite a myriad of other facts and Defendants counter many of these with opposing declarations, these additional facts are generally immaterial. Standing and jurisdiction can

be established from the undisputed facts. With regard to factual disputes which reach beyond the issue of standing, I note that the scope of jurisdiction to be exercised in this case is limited to the administrative record. Olenhouse v. Commodity Credit Corp., supra. Because judicial review is in the nature of an appeal and entails only a determination of the sufficiency of the record and the reasonableness of the administrative decision, facts outside the record or unnecessary to the agency's final determination are immaterial. A *de novo* determination of factual arguments between the parties is unnecessary and precluded. Id.; Mount Evans Company v. Madigan, supra.

Based on undisputed facts, then, Plaintiffs in this case meet both individual and associational requisites to establish constitutional standing. Plaintiffs' members have personally suffered injury in fact which is either current or immediately foreseeable. Even though Defendants insist that economic injuries cannot fall within NEPA's zone of interests, the economic injury immediately and actually threatening Plaintiffs' members--which includes loss of livestock to a predator known to have killed livestock in the past--presents real and substantial injury in fact directly traceable to Defendants' plans to reintroduce increasing numbers of Mexican wolves into Plaintiffs' environ-ment. A favorable decision, both in terms of a declaratory judgment voiding the FWS Final Rule and a permanent injunction prohibiting the release of wolves into Plaintiffs' members' geographic area, completely remedies the dangers facing Plaintiffs' members and their economic interests. Thus, neither tracing of Plaintiffs' injuries to the government action at issue nor the question of redress-ability presents a serious hurdle to the conclusion that Plaintiffs in this case have established constitutional standing.

Defendants contest the conclusion that the facts Plaintiffs assert to establish standing total a legally sufficient injury principally because Defendants characterize Plaintiffs' injuries as solely economic. Defendants argue that economic injuries cannot satisfy a NEPA zone-of- interest test.

Defendants err, however, in characterizing the injuries which Plaintiffs' members face as "purely economic." The changes Plaintiffs fear or reasonably infer and anticipate in their environment and life-style, totally apart from the killing of livestock, are particularized, concrete and imminent, as well. These include concerns for personal safety, diminished opportunity to hunt, fish and recreate in wolf recovery areas, heightened threat to other animals and plants in the area, consequential limitations on the use of private land, and loss of aesthetic opportunities. These injuries which presently harm or imminently threaten Plaintiffs' members clearly are not purely economic in nature. Plaintiffs' injuries encompass harm to life-style and aesthetic interests which are wholly in line with those recreational and aesthetic injuries which have been the basis for standing in numerous other environmental actions. See e.g.: Committee to Save the Rio Hondo v. Lucero, supra; Catron County Board of Commissioners v. Fish and Wildlife Service, supra; State of Utah v. Babbitt, 137 F.3d 1193, 1213-1215 (10th Cir. 1998). Plaintiffs clearly demonstrate constitutional standing based on non-economic, as well as economic injuries. What remains is the applicability of each of the statutes on which Plaintiffs rely and a prudential or "zone of interest" inquiry.

### l. NEPA

Defendants' arguments that the interests Plaintiffs seek to protect are "purely economic" are specifically directed to Plaintiffs' standing to bring a case under NEPA. Citing Wyoming Farm Bureau Federation v. Babbitt, 987 F. Supp. 1349 (D.C. Wyo.1997), both the federal Defendants and Defendant-Intervenors contend that economic harm lies outside the zone of interests protected by NEPA and that allegations of economic harm alone cannot confer NEPA standing.

Defendants' position is not entirely accurate. The absence of standing in the Wyoming Farm Bureau case did not result from the economic nature of the Plaintiffs' injuries, but from the fact that

even if the relief sought were granted, it would not redress the injury alleged. The <u>Wyoming Farm Bureau</u> decision does not hold that NEPA standing can never be premised on an economic injury. To the contrary, the decision indicates that *if* resolution of the plaintiffs' case could have conferred the economic benefit the plaintiffs sought, standing may have been present. The court concluded that:

> . . . even if Wyoming obtained its requested relief and the court upset the Bureau of Land Management's coal-for-easement exchange, it would still be within the Secretary's discretion whether to allow competitive leasing of the federal coal. . . . Thus, because Wyoming would only receive royalty payments if the coal were open to competitive leasing and because that decision is 'vested absolutely' with the agency and not with the judiciary, we held that 'a favorable ruling . . . would not guarantee the State one nickel of coal leasing royalties from these lands." <u>Mount Evans Company v. Madigan</u>, <u>supra</u> at 1450-1451.

Likewise, in <u>Ash Creek Mining Company v. Lujan</u>, 969 F.2d 868 (10th Cir. 1992), the Court of Appeals did not find an absence of standing based on the economic nature of the plaintiff's alleged injuries, but rather on the non-redressable nature of the economic injuries alleged. In <u>Mount Evans Company v. Madigan</u>, <u>supra</u>, the Court of Appeals found that a Colorado county threatened with loss of revenue sharing funds and tax monies and alleging nothing other than economic injury met both Article III and prudential standing requirements. <u>Id</u>. at 1450. Thus, I am not persuaded that economic injury cannot be a sufficient basis on which to premise standing under NEPA, particularly where, as in the present case, reasonably inferred harm to domestic livestock and other wild and possibly endangered animals, harm to grazing and aesthetic opportunities, as well as limitations on the customary human and natural uses of both public and private land inherently includes simul-taneous economic and non-economic interests.

In the First Amended Complaint, Plaintiffs state that their members live, work, recreate, hunt

and fish near their farms and ranches, which are both adjacent to and within the wolf recovery area. Plaintiffs aver recreational and aesthetic uses of public and private lands and changes in environment likely to be harmful to both Plaintiffs and members and likely to restrict use of the land and environment in the members' proximity. Similar statements have become fairly standard asser-tions in environmental suits; and allegations of this nature are ordinarily sufficient to confer standing to sue where actions are brought under either the ESA or NEPA. See: e.g.: <u>Bennett v. Spear</u>, <u>supra</u>; <u>Committee to Save the Rio Hondo v. Lucero</u>, <u>supra</u> at 447.

Plaintiffs also state they are injured (1) by failure of FWS to prepare a proper and legally sufficient FEIS, and (2) by FWS acceptance of a poorly prepared FEIS which directly results in ill-informed and unreasonable choices. Plaintiffs list a range of scientific and factual disputes with the FEIS and also attack FWS procedures, methodology and conclusions. Plaintiffs insist that the FEIS by which Defendants justify their final plans grossly underestimates the predatory effect of wolves on domestic livestock and fails to consider several other significant environmental impacts attribut-able to a reintroduction of the wolf into Plaintiffs' immediate surroundings. Plaintiffs also contend that FWS is mistaken in its belief that newly released wolves will not endanger other protected species.

By all of this, Plaintiffs allege standing within NEPA's zone of interests. "The injury of an increased risk of harm due to an agency's uninformed decision is precisely the type of injury the National Environmental Policy Act was designed to prevent." <u>Committee to Save the Rio Hondo v. Lucero</u>, <u>supra</u> at 447. NEPA demands that a federal agency "*weigh* the benefits of a project versus the detrimental effects" of that project and make a well-informed decision. <u>Marsh v. Oregon National Resource Counsel</u>, 490 U.S. 360, 372 (1989); 42 U.S.C. sec. 4332(2)(C).

Contrary to Defendants' arguments, then, Plaintiffs' case rests within NEPA protections.

Alleging they have suffered, or will suffer harm from Defendants' failure to prepare a legally sufficient FEIS, Plaintiffs seek to force Defendants to include in a supplement to the FEIS all of those matters which Plaintiffs contend are lacking in the decision-making process to date. Failure of a federal agency to prepare an environmental impact statement when required is actionable. Committee to Save the Rio Hondo v. Lucero, supra at 452. Conversely, presentation of an environ-mental impact statement which is obviously incomplete and legally insufficient is also actionable. Id. at 446. Courts recognize that "an individual may enforce procedural rights 'so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." State of Utah v. Babbitt, supra at 1215; 42 U.S.C. sec. 4332(2)(C). "While the National Environmental Policy Act itself does not mandate the particular decisions an agency must reach, it does mandate the necessary process the agency must follow while reaching its decision." Committee to Save the Rio Hondo v. Lucero, supra at 447.

Plaintiffs meet a two-prong standard. First, Plaintiffs "must show that in making its decision without following the National Environmental Policy Act's procedures, the agency created an increased risk of actual, threatened, or imminent harm." Id. at 449. Second, Plaintiffs "must show that the increased risk of environmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action." Id. Plaintiffs satisfy these elements and establish standing with the zone of interests protected by NEPA.

Those seeking to enforce procedural requirements under NEPA must rely on the APA; NEPA (unlike the ESA) confers no private right of action. Id. at 447. In this case, Plaintiffs properly invoke jurisdiction under the APA, and I see no impediments to standing or jurisdiction on Plaintiffs' NEPA-APA claims.

## 2. The ESA

Unlike NEPA, the ESA expressly provides for direct access to the courts. The ESA states that "any person may commence a civil suit on his own behalf--(A) to enjoy any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter . . . ." 16 U.S.C. sec. 1540(g)(1). Thus, while a demonstration of standing under the ESA requires a usual showing of constitutional elements, the ESA does not require application of the "zone of interest" test. <u>Bennett v. Spear</u>, <u>supra</u> at 164, 166. At the same time, the ESA's "citizen suit" provision is expressly limited. The statute reads in part: "No action may be commenced under subparagraph (1)(A) . . . (i) prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator . . . ." 16 U.S.C. sec. 1540(g)(2)(A).

The latter provision is pertinent to the present case because Defendants challenge juris-diction pursuant to the ESA not only on general grounds of standing, but also by the argument that Plaintiffs have failed to exhaust administrative remedies and meet the conditions precedent to filing a court action. Defendants argue that the 60-day notice requirement is a mandatory precondition to exercise of a district court's jurisdiction and that prospective plaintiffs must strictly adhere to its requirements. Defendants contend that Plaintiffs' failure to provide a 60-day notice deprives a court of all jurisdiction over issues grounded in the ESA.

The notice requirement at issue is identical to the notice requirement in the Resource Con-servation and Recovery Act. 42 U.S.C. sec. 6972(b). The latter requires dismissals of claims brought under the Act where plaintiffs have failed to provide the mandatory notice. <u>Hallstrom v. Tillamook County</u>, 493 U.S. 20, 32-33 (1989). I see no reason to view the ESA's notice requirement any

differently. The plain language of the statute appears to operate as an absolute bar. Therefore, I conclude that the ESA's 60-day notice requirement for "citizen suits" excludes potential plaintiffs who fail (a) to provide notice of their complaints to the allegedly offending agency, and (b) to wait 60 days after delivery of the notice before commencing suit.

Plaintiffs in the present case have failed to comply with these requirements. Plaintiffs state generally that they are not required to exhaust administrative remedies and that a federal district court may properly exercise jurisdiction over all ESA issues in dispute  This is mistaken. Plaintiffs state in their First Amended Complaint that they filed a Notice of Intent to sue "pursuant to the ESA," but in later filings, Plaintiffs admit not waiting sixty days between sending the notice and filing suit. Plaintiffs' letters on which they base compliance with ESA demands are dated March 24, 1998, and May 8, 1998. Plaintiffs' first Complaint was filed March 26, 1998;  the First Amended Complaint was filed May 11, 1998. Without 60 days from the date of the notice to the date of  filing a civil action, the ESA provides no grant of jurisdiction to a district court. Because Plaintiffs have failed to meet prerequisites to a private right of action which are clearly set out in the statute, they can bring no claims and seek no remedies which might result directly from the ESA.

At the same time, it does not appear that jurisdiction derived directly or solely from the ESA is necessary for what Plaintiffs seek to achieve by this action. "No one contends (and it would be not be maintainable) that the causes of action against the Secretary set forth in the ESA's citizen suit provision are exclusive, supplanting those provided by the APA." Bennett v. Spear, supra at 175. As Defendants point out, Plaintiffs should not be able to bypass an explicit requirement of the ESA by bringing a case solely on the basis of the APA. Yet, Defendants' arguments and absence of a right of action pursuant to the ESA are beside the point in the present case. What the decision in Bennett

v. Spear intends or endorses need not be decided. Plaintiffs in the present case legitimately reach APA jurisdiction by reason of their claims under NEPA. Were it not for a viable NEPA claim, the question would be far more difficult. As it is, because of the NEPA claim, the APA--and through it the ESA--must apply. Irrespective of Plaintiffs' failure to invoke the ESA directly and without consideration of whether Plaintiffs are granted an open door they should not otherwise have had, determination of the reasonableness and sufficiency of an administrative record pursuant to the APA requires a plenary review. Olenhouse v. Commodity Credit Corporation, supra. And a plenary review must include an examination of whether the agency action at issue complies with the ESA. Because Plaintiffs' action is plainly for review of the FWS decision to release Mexican wolves into the designated recovery area, reliance on the ESA becomes extraneous, so long as Plaintiffs establish constitutional standing, meet a NEPA zone-of-interest test and come within the range of subject matter explicitly reviewable by invoking the APA.

Judicial analysis must necessarily entail consideration of whether or not the FWS wolf recovery program comports with applicable laws. The first among applicable laws is the ESA. It is impossible to determine whether FWS decisions constitute rational choices if the question of compliance with legislation prompting the recovery plan is never asked. Thus, even though Plaintiffs might be precluded from using the ESA or the APA from opening the courthouse door, there is no way to extract ESA requirements from consideration. Finding no grant of jurisdiction which derives directly from the ESA can make no appreciable difference, then, in how the record of FWS's decision-making process is to be examined. ESA issues must be fully considered in order to decide the reasonableness of the wolf recovery program in its present form.

## 3. The APA

What Plaintiffs pursue by this action is an examination of (a) whether Defendants compiled an administrative record sufficient to establish that FWS took a hard look at the issues, (b) whether FWS actions are arbitrary and capricious, and (c) whether the FWS program comports with all applicable laws so as to constitute a rational decision. All of this is controlled by the APA. Bennett v. Spear, supra; Olenhouse v. Commodity Credit Corporation, supra.

To determine whether standing exists to bring an APA suit, the standard applied refers to a substantive statutory provision which provides legal grounds for the claims asserted. Bennett v. Spear, supra at 175. Again, the injury must be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Clarke v. Securities Industry Association, 479 U.S. 388 (1987). As stated, the substantive statutory basis in the present case is provided by NEPA, and Plaintiffs have been found to raise claims within NEPA's stated protections.

An APA suit also requires a plaintiff to identify a "final agency action." Catron County Board of Commissioners v. Fish and Wildlife Service, 75 F.3d 1429, 1433 (10th Cir. 1996). "[T]he party seeking review under 702 must show that he has 'suffer[ed] legal wrong' because of the challenged agency action, or is 'adversely affected or aggrieved' by that action 'within the meaning of a relevant statute.'" Lujan v. National Wildlife Federation, 497 U.S. 871, 883 (1990). The present case satisfies this APA standing requirements in that Defendants' acceptance of the FEIS, publication of a Final Rule and initiation of wolf releases into designated areas constitutes a "final agency action."

Plaintiffs properly rely on the APA for both standing and jurisdiction. "Whether a plaintiff's interest is 'arguably . . . protected . . . by the statute' within the meaning of the zone-of-interest test is to be determined not by reference to the overall purpose of the Act in question . . ., but by

reference to the particular provision of law upon which the plaintiff relies." Bennett v. Spear, supra at 175-176. Plaintiffs' suit need not vindicate the overall purpose of NEPA in order for NEPA to support Plaintiffs' APA standing. Id. Plaintiffs need only show that the injuries complained of violate a statutory provision contained in NEPA. Id. They have done so.

Standard of Review

By motion for summary judgment pursuant to Fed. R.Civ.P.56, Plaintiffs seek a declaratory judgment and a permanent injunction. Plaintiffs state there are no genuine issues of material fact in dispute. At the same time, Plaintiffs' Opening Brief on the Merits acknowledges that judicial review of agency actions is controlled by the APA and that the reviewing court must determine from the administrative record whether Defendants considered all relevant factors and engaged in a genuine and reasoned decision-making process. In other words, whether or not there are facts at issue, review of an administrative decision is not amenable to the process of summary judgment. The ultimate determination must be made through an appeal process whereby the district court reviews, and is strictly limited to the record of factual information before the agency at the time it engaged in its decision-making process. Olenhouse v. Commodity Credit Corporation, supra. Even though Plaintiffs frame a pending motion in terms of Fed. R. Civ P. 56, summary judgment is not a proper procedural framework, and I treat the case as an appeal. Id.at 1573.

The essential functions of judicial review are to determine: "(1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." Id. at 1574; State of Utah v. Babbitt, supra; 5 U.S.C. sec. 706(2)(A). "The duty of a court reviewing agency action under the 'arbitrary and capricious' standard is to ascertain whether the agency examined the rele-

vant data and articulated a rational connection between the facts found and the decision made. Olen-house v. Commodity Credit Corp., supra.

"The agency need only demonstrate that it considered relevant factors and alternatives after a full ventilation of issues and that the choice it made was reasonably based on that consideration." Mount Evans Company v. Madigan, supra at 1452. "The agency must make plain its course of inquiry, its analysis and its reasoning." Olenhouse v. Commodity Credit Corp., supra 1575. The review focuses on the rationality of an agency's decision-making process and not on the rationality of the actual decision. Id. at 1574. Where the agency makes this showing, a district court does not replace the agency's judgment with its own. Mount Evans Company v. Madigan, supra at 1452. A court must uphold the agency decision if the agency presents a rational underlying basis for its determinations. Id. Finally, even though an agency's actions are not shielded from a thorough, probing, in-depth review, agency decisions are entitled to a presumption of regularity. Olenhouse v. Commodity Credit Corp., supra at 1560.

In deciding the sufficiency of the administrative record, I have not considered what Plaintiffs' refer to as the "Livestock Depredation Report" (Exhibit 1 to the Opening Brief). This report consists of an analysis by Dr. Michael J. Maceina of the extent to which reintroduction of the wolf into Arizona and New Mexico may result in depredation of cattle, sheep and other large ungulates. Dr. Maceina's analysis reinterprets FWS data on depredation. It also criticizes FWS reliance on studies from Montana, Minnesota and Alberta and instead emphasizes depredation studies from Spain and Italy which FWS did not include in either its considerations or its administrative record. (The latter are also referred to in the parties' briefs as the Blanco and Meriggi studies.)

According to Plaintiffs, Exhibit 1 is included "to highlight the fact that the FWS completely

ignored two highly relevant published scientific articles regarding wolf depredation of livestock." Plaintiffs argue that Exhibit 1, as well as the two additional studies, are properly included in a judicial review because (1) the information is relevant, (2) there are exceptions to the rule that a reviewing court may consider only evidence contained in the administrative record, and (3) the additional report and the two European studies fall within one of these exceptions to the general rule and therefore are permissibly included for consideration. Plaintiffs contend Exhibit 1 falls within one or more of the exceptions to excluding extra-record materials because (a) the agency failed to consider factors which are relevant to its final decision, (b) the exhibit arises after Defendants' final action and indicates whether or not Defendants' decision was correct, and (c) extra-record evidence is permitted in NEPA cases.

I find, however, that none of these exceptions or any other apply. The case law on which Plaintiffs rely focuses on situations where an agency "neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternatives, or otherwise swept 'stubborn problems or serious criticisms . . . under the rug' . . . ." County of Suffolk v. Secretary of the Interior, 562 F.2d 1368, 1385 (2d Cir. 1977). These circumstances are not applicable to the case at hand. Only if Defendants had accepted  nothing or very little information on the issue of livestock depredation might I find the Plaintiffs' exhibit a permitted addition for purposes of judicial review. The agency's record need not include a comprehensive review of all available data on any single issue. If that were true, new, obscure or redundant materials would be a constant source for challenging and overturning legitimate agency action. Judicial review may include additional materials, and these can be forced upon an administrative agency for consideration only if the agency acted arbitrarily and capriciously in excluding or ignoring the material. Village of  Los Ranchos de Albuquerque v. Marsh, 956 F.2d

970 (10th Cir. 1992), *cert. denied* 506 U.S. 817 (1992).

In the present case, the FWS did not ignore the issue of livestock depredation. Defendants reached conclusions and projected depredation rates contrary to Plaintiffs' beliefs. Defendants did not include in its information-gathering process all that Plaintiffs would have included. This is not a controversy which I need to resolve. In either regard, my opinion as to which side is right makes no difference.

FWS clearly reviewed a considerable amount of opinion and data highly pertinent to the issue of livestock depredation. The administrative record does not support a conclusion that depredation studies were selected or excluded because they were or were not adverse to releasing wolves in the wild. I cannot conclude that from what Defendants failed to consider (namely Plaintiffs' Exhibit 1 and the two wolf depredation studies from Europe) that Defendants acted arbitrarily in not utilizing the additional data or that by its exclusion Defendants' decision on the issue of depredation was ill-informed. Therefore, the question for judicial review is only whether or not the administrative record is so devoid of pertinent data that it fails to demonstrate a rational decision-making process; and the exceptions Plaintiffs cite for including the extra-record materials cannot apply. Judicial determin-ation on the merits of Plaintiffs' claims must be based on a review of the entire administrative record as it was before the agency when the agency made its decisions. Florida Power and Light Company v. Lorion, 470 U.S. 729, 743 (1985); Citizens to Preserve Overton Parks v. Volpe, 401 U.S. 402 (1971). I cannot consider what Plaintiffs' have marked and referred to as Exhibit 1 to Plaintiffs' Opening Brief and judicial review has been strictly confined to the administrative record.

## The Final Environmental Impact Statement
## and Sufficiency of the Administrative Record

Recognition of the wolf as a carnivore stands face to face with the mandate of the Endangered Species Act which obligates Defendants to take positive steps to promote recovery of the Mexican gray wolf in the Western United States. Certainly, it is easy to understand why grave concerns for livestock depredation attributable to a reintroduced wolf population remain at the forefront of Plaintiffs' claims in the present case. Plaintiffs' fears may be fully warranted. Since the gray wolf has been essentially absent from the entire Western United States for several decades, the impact of its reintroduction at this time is obviously impossible to predict with any degree of certainty. Not only in Arizona and New Mexico, but also in Idaho, Montana and Wyoming, the principle source of hostility to wolf recovery plans remains long-standing expectations that reintroducing the wolf into any part of its original habitat will result in large and repeated loss of livestock. Depredation of livestock is of particular concern in Arizona and New Mexico where a variety of economic statistics indicate that many, if not most, farmers and ranchers live a marginal lifestyle. If the reintroduced wolf exacts from these livestock producers any price whatsoever, the economic loss alone is unlikely to be absorbed without great hardship.

When Plaintiffs in this case allege that FWS has failed to comply with NEPA requirements and has issued an inadequate FEIS, Plaintiffs' complaints largely center on the conviction that FWS has grossly underestimated the amount of domestic livestock likely to be lost to wolf depredation. Whether it be calculation of expected depredation rates or any other uncertainty, however, it is not the purpose of judicial review to decide whether Plaintiffs' expectations or Defendants' predictions represent the correct or most probable outcome of the FWS wolf recovery plan. Judicial review seeks

31

only to determine whether the final agency action meets statutory imperatives, is supported by a reasonable environmental impact statement and a sound administrative record, and constitutes a well-informed decision. A district court does not substitute its judgment on substantive issues unless an agency's choices are without factual basis or are legally barred. Olenhouse v. Commodity Credit Corp., supra.

NEPA, as well, merely dictates an agency's procedure, not its substantive decisions. If an agency has considered all relevant environmental effects, it can pursue its course of action. Friends of the Bow v. Thompson, 124 F.3d 1210 (10th Cir. 1997). Regardless of how strenuously an action is opposed, or how justified its opposition, the final administrative decision cannot violate NEPA unless the agency action is essentially uninformed. Id. It is therefore within these parameters that I examine Plaintiffs' challenges to the Final Environmental Impact Statement and the administrative record.

### 1. Expected Rates of Depredation

Plaintiffs contend generally that the FEIS at issue in this case is seriously flawed. They believe it to be deficient (a) by its use of methods and data inappropriate to the ultimate purpose of the agency action, recovery of the Mexican wolf, and (b) by its exclusion of expert opinions critical of FWS methodology and data contradictory to FWS conclusions. Plaintiffs argue that the FEIS accepted by FWS cannot meet even the most minimal NEPA requirements because it "failed to report data, misused data, and generally misrepresented the predation of Mexican wolves."

More specifically, while Plaintiffs and Defendants agree that the Southwest United States presents unique circumstances, Plaintiffs contend that use of wolf depredation studies from Minnesota, Montana and Alberta, Canada, to project livestock losses in New Mexico and Arizona is

wholly inappropriate. Plaintiffs believe that the studies from Spain and Italy align far better to the situation in the American Southwest. Plaintiffs argue strenuously that rather than the studies used by FWS, anticipated livestock depredation rates for New Mexico and Arizona would have been more accurately calculated by reference to wolf depredation of livestock in Spain and Italy where the studies indicate a much higher loss.

Even though Plaintiffs' concerns are legitimate, Plaintiffs' focus does not create a legal impediment to implementation of the FWS wolf recovery plan in its current form because Plaintiffs' arguments do not address issues which FWS failed to consider. Plaintiffs' arguments represent a strong disagreement with FWS conclusions and a desire to see presentation of a livestock depredation rate high enough to move the proposed wolf population to other and far removed recovery ranges. Plaintiffs' disagreements with the agency's ultimate conclusions, however, no matter how certain or how strenuous, are not enough to support Plaintiffs' case or warrant the remedies Plaintiffs seek. FWS neither neglected the issue of livestock depredation nor failed when preparing its wolf recovery plan to see the issue as the most prominent reason for local animosity to reintroduction of the wolf into Arizona and New Mexico.

In addition, Plaintiffs' err in their supposition that FWS based its projected rate of livestock depredation solely on wolf depredation experiences in Minnesota, Montana and Alberta. Similarly Plaintiffs are incorrect in the proposition that the studies from Spain and Italy necessarily must be included or are so absolutely germane that a final agency action cannot be made without considering them. Whether or not to utilize the livestock depredation studies from Spain and Italy is a judgment call, and in the administrative record FWS justifies its choice. It is not the purpose of judicial review to substitute a judgment. It is impossible to say whether the projection of livestock depredation that

results from FWS choices is accurate or misleading. The decision to rely on the studies from Minnesota, Montana and Alberta, however, is not clearly arbitrary. FWS presents a rational basis for selecting the North American studies and for not including the European studies in its projections. I can require no more. Olenhouse v. Commodity Credit Corp., supra.

Nothing requires the FWS analysis or the FEIS to be exhaustive. Contrary to Plaintiffs' arguments, NEPA requires only that a government agency undertaking a major federal action make rational choices by employing a reasonable and reliable process; NEPA does not direct that a completely exhaustive scientific study by completed or that any particular result be reached. Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989). The extent of any review of scientific literature or the amount of evidence to be considered, as well as determinations of what constitutes the best or most appropriate evidence are matters left to the agency, at least until it appears the agency is not acting objectively or is intentionally excluding clearly relevant and necessary materials. "The duty of a court reviewing agency action under the 'arbitrary and capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." Olenhouse v. Commodity Credit Corp., supra at 1574.

Where questions are raised as to the sufficiency of the evidence, a "district court must review the agency's decisionmaking process and conduct a plenary review of the facts underlying the challenged action." Id. at 1565. Having done so, I find that FWS made a thorough study of the likelihood of livestock depredation should the Mexican wolf be reintroduced into Arizona and New Mexico. It collected a considerable amount of data on wolf depredation in addition to the Minnesota, Montana and Alberta studies with which Plaintiffs take issue. Much of what FWS collected was

comprised of expert opinions, several looking at wolf depredation beyond the three studies which Plaintiffs believe were the sole considerations. The scientific opinions considered and the experts consulted also looked at the Minnesota, Montana and Alberta studies critically; they did not fail to note the differing attributes of other geographical areas that should not be attributed to the Southwest or be the basis of assumptions with regard to projecting what might happen with the Mexican wolf in Arizona and New Mexico.

Obviously, wolf depredation rates depend on numerous and highly variable factors. These include the extent of natural prey in the area (such as deer, elk, antelope, javelina, fox, beaver, rabbit and rodents), the seasonal migrations of the natural prey, environmental factors which affect the vulnerability of natural prey, the presence of other major predators and their effects on prey populations in the area, landscape, climate, the extent and location of hunting and recreational events, livestock management practices, the prominence of grazing leases and the amount of cattle, sheep, horses and mules in and near the recovery areas. Livestock depredation is especially difficult to anticipate in the Southwest. In addition to the many factors likely to make a difference, livestock depredation rates in the Southwest are likely to be influenced by calving on the open range, higher densities of cattle, common problems locating missing livestock because of difficult terrain, lower wild prey availability and a complete lack of past experience or annual averages.

As the FEIS explicitly notes, it is not only difficult to assess future livestock depredation rates in Arizona and New Mexico, it is difficult to assess past reports of the Mexican wolf's impact on livestock because the historical and biological data necessary to do so does not exist. All that is available is qualitative projections, and I have no basis by which to throw out those that have been made. With no existing data with which to define the range necessary for a wolf population in the

Southwest to acquire its preferred natural prey and little data in regard to the amount of prey required to maintain a viable Mexican wolf population, FWS has supported it projections by expert opinions, scientific studies, a  search of the available literature, and its experiences with other wolf recovery plans. Contrary to what Plaintiffs insist, the FWS conclusions are supported by the administrative record.

It is not capricious for FWS to project that mule deer, white-tailed deer, javelina and elk will be of primary importance in wolf diets, depending, of course, on their availability. The gray wolf preys primarily on large wild ungulates. Wolves are known, of course,  to move easily from one type of prey to another, and this makes it especially difficult to predict their impact on any one prey in its vicinity, and as Plaintiffs and other livestock producers have stated for the record, wolves are opportunistic killers. FWS anticipates, however, that sufficient large wild ungulates will be available in the recovery area. FWS anticipates a fairly stable deer population in the recovery areas, with mule deer expected to be the staple food of the Mexican wolf in New Mexico.

Traditionally, small mammals may become part of wolf diets if large ungulates are scarce. The FWS studies of potentially available prey in Arizona and New Mexico thus identified not only deer, gemsbok (also called oryx or gazelles), javelina, bighorn sheep, feral horses, wild turkey and a small population of pronghorn antelope as potential prey, but also surveyed smaller mammals as a potential secondary food source. FWS found beaver, fox, black-tailed jackrabbits, cottontails, snowshoe hares, squirrels, fox, prairie dogs and several other small animals available throughout in the wolf recovery areas.

Clearly, in view of the several variables that influence the availability of the Mexican wolf's natural prey and with little on which to base where the Mexican wolf might travel, it is fair to say that

neither Plaintiffs nor Defendants are well-positioned to predict either livestock depredation rates or final outcomes. In attempting to arrive at a realistic assessment, it is also fair to say that FWS conducted a thorough and reasonable analysis and from every indication investigated potential wild prey and projected a livestock depredation rate in good faith.

The several experts consulted by FWS weighed not only the many variables involved, but also the extent to which mitigation measures could reduce depredations. Although the ESA protects the wolf in the 48 contiguous states and use of choking neck snares and other kill devices are banned, some flexibility in what is legally permitted in Arizona and New Mexico is achieved by the designation of the newly introduced wolves as "nonessential" and "experimental" populations. This allows for "taking" under certain circumstances. Taking includes killing, harming or capturing; and by FWS regulations enacted as part of its Mexican wolf recovery plan, some taking is permitted and anticipated. Other measures made permissible in an attempt to reduce livestock depredation include the right to harass, track and relocate wolves. Additionally, a private compensation fund exists which can make payment to livestock producers for depredations attributable to wolves.

Thus, even though Plaintiffs adamantly disagree with FWS projections and anticipate losses in much higher numbers, FWS estimates of livestock depredation stand as an acceptable analysis which is adequately supported by the administrative record. The disagreement of experts on the manner in which depredation rates should be calculated--even were Exhibit 1 to Plaintiffs' Opening Brief to be considered--is not enough for a district court to invalidate an FEIS or a final agency action. Committee to Preserve Boomer Lake Park v. Department of Transportation, 4 F.3d 1543, 1553 (10th Cir. 1993). "Courts are not in a position to decide the propriety of competing methodologies . . . " Id. Judicial review can look only to whether a challenged method has a rational basis

and took into consideration all relevant factors. Id. I am satisfied that in this instance the FWS approach to projecting wolf depredation rates for the Mexican wolf recovery plan encompasses both requisites.

## 2. The Possibility That the Recovery Plan Includes Hybrid Wolves

Plaintiffs assert that the FEIS as published is legally inadequate because it fails to consider the possibility that captive wolves selected for release in the wild are not genetically pure, and further, that the wolves bred and raised in captivity actually have been intermixed with coyotes and dogs so as to render them hybrids. Plaintiffs point out that (a) the ESA does not authorize release of hybrids; (b) the ESA provides no protection of hybrid populations as threatened or endangered; and (c) hybrid wolves are highly unlikely to preserve the species.

Even though the issue is not discussed in the FEIS, FWS examined questions of hybridiza-tion very thoroughly. By a considerable amount of material included in the administrative record, it is clear FWS reviewed scientific studies, expert opinions and peer-reviewed publications. Much of the scientific evidence initiated or considered came from the work of professors and staff at several colleges and universities. This research included pedigree analysis, use of molecular geno-types and gene survival calculations, physical examination of skull specimens, DNA and other genetic assessments, as well as evaluations by a panel of fifteen wolf experts. The research and expert opinion FWS collected for review carefully traced three breeding lines which were respon-sible for the wolves held in captivity. From the data considered, FWS concluded that all three genetic lines were free of introgression from dogs and coyotes and were "genetically pure" Mexican gray wolves.

Reviewing the scientific evidence in the record and made available to FWS on the issue of hybridized wolves, I find a strong record which supports FWS conclusions with a high degree of

certainty. FWS has acted reasonably and objectively in these evaluations and has considered a variety of evidence. It appears the information FWS has included in the administrative record supports only the conclusion that the captive wolves raised in captivity and selected for reintro-duction are genetically pure Mexican gray wolves and not hybridized. Some data leaves what is referred to as the Ghost Ranch lineage of the captive wolves less certain than the other two genetic lines identified, but the weight of the evidence clearly supports FWS conclusions. The entirety of the administrative record includes such a complete analysis of the issue that whether or not it is covered by the FEIS is of no import. I am satisfied that this is not an area ignored by FWS and that the conclusions reached by FWS on the subject are well-supported by factual data that is scienti-fically sound. The ultimate decision that the released wolves are Mexican gray wolves is neither arbitrary nor capricious; it is supported by substantial evidence.

### 3. Presence of a Naturally Occurring Wolf Population

According to Plaintiffs, the FWS decision to take selected wolves from the captive popula-tion and release them into the wild is contrary to law because the designated wolf recovery area is currently occupied by naturally occurring Mexican gray wolves. The ESA, Plaintiffs state, prohibits introduction of an experimental population when it will not be wholly separate geographically from nonexperimental populations of the same species.

Plaintiffs' belief that individual Mexican gray wolves can be found in the wolf recovery area independent of those released or to be released by FWS is based on anecdotal information presented in the form of unverified reports and affidavits by individuals who believe they have encountered gray wolves in their immediate proximity. ( I note that at the same time Plaintiffs insist the Mexican wolf is now as a species inextricably intertwined with dogs and coyotes and incapable of identifica-tion as

a "wolf," Plaintiffs also insist that the reported incidents of individuals encountering what could have been a dog, a wolf, or a hybrid are most certainly reports of a Mexican gray wolf.)

Other than unverified individual reports or "sightings," Plaintiffs offer nothing to support their belief that Mexican gray wolves are to be found roaming parts of the American Southwest. FWS investigated reports of wolf sightings and these investigations are included in the administrative record. The FEIS (at pp. 3-5 and 3-6) acknowledges that since 1983, it has received six unconfirmed reports of animals alleged to be wolves in the Blue Ridge Wolf Recovery Area.

In spite of what Plaintiffs proffer, however, the last verified sighting of a Mexican gray wolf in New Mexico was in 1976, and the last confirmed sighting in Arizona was in 1983 or in 1995, depending on the reference consulted. What Plaintiffs put forward, on the other hand, to support their contentions are unverified anecdotes that were better presented to FWS as public comment on the draft environmental impact statement.

What Plaintiffs present with their briefs in this case are affidavits that under the circum-stances contain little indicia of reliability and consequently have little, if any, evidentiary value. I cannot conclude from what Plaintiffs present that gray wolves apart from any released from captivity currently exist in the wolf recovery area. More importantly, I cannot conclude from the administrative record that FWS errs in its conclusion that they do not. Reviewing the record, it is clear that the scientific and historical literature is unanimous in the conclusion that the Mexican gray wolf was eliminated from the Southwest United States at least by the early 1970s, if not earlier. Given this, Plaintiffs need, rather than individual affidavits averring private occurrences, some support from the scientific community that the Mexican wolf is likely to be found not only in the Southwest, but also separable from social packs and in or near the supposed recovery locations. None, however, is

provided. In the final analysis, the possibility that isolated wolves continue to live in Arizona and New Mexico, given that every source which speaks to the subject considers the wolf extirpated from these regions, is too remote and speculative to provide the basis of a legal challenge.

In contrast, FWS addressed the issue by conducting and collecting wolf howling surveys in seven different habitat areas. Responses were recorded and identified from coyotes, dogs, cows, turkey, and seven species of owl, but none as coming from wolf-like canids. FWS also employed other investigative techniques, including scent post monitoring and surveys of howling routes, searches for dens and killing sites, examination of roads and water sources for tracks or other signs of wolf, plaster of paris track casting, use of recording devices, operation of remote cameras, and formal investigation of reported sightings. Again, the possibility that the wolves selected for release may not be true Mexican gray wolves is not an issue FWS failed to consider or to evaluate reasonably and objectively and the conclusions reached by FWS are neither arbitrary nor capricious; they are supported by substantial evidence.

### 4. Consideration of Other Endangered Species

Plaintiffs also contend that FWS, and consequently the FEIS, has not considered the indirect environmental effects of the Mexican wolf recovery plan on vegetation and other animals in the wolf recovery areas. As a minimum mandatory consideration, Plaintiffs argue, FWS violates both NEPA and the ESA by failing to weigh the extent to which release of the Mexican gray wolf jeopardizes other endangered and threatened species.

Plaintiffs are incorrect. The administrative record clearly demonstrates otherwise. With regard to other wildlife, FWS acknowledges numerous endangered species in or near the wolf recov-ery areas. The FEIS and the administrative record also admit to the uncertainty of multiple impacts upon

endangered plants and animals. Regardless of the extent to which it was covered, or not covered by the FEIS, the issues of competing ecological needs were thoroughly considered. The FEIS (at p. 3-6) names several endangered species of serious concern.

In developing its wolf recovery plan and selecting a wolf recovery area, FWS considered data on numerous species in both New Mexico and Arizona. It collected information on endangered and threatened species in several forms. It also collected extensive information on the presence and density of other animals, especially large ungulates expected to serve as wolves' primary prey, thus mitigating predation of protected species. Protected species FWS lists as within the Blue Ridge Wolf Recovery Area include the Gila trout, the Gila topminnow, the American peregrine falcon, the whooping crane, the bald eagle and the black-footed ferret. FWS also considered the potential impact to the white-sided jackrabbit, the Mexican spotted owl, the desert bighorn sheep, the spotted bat and the wild turkey, among several others. In plants, FWS also identified several protected species in the wolf recovery areas. These included the Parish's alkali grass, Mimbres figwort, Mogollon clover, the grama grass cactus, the Pinos Altos flameflower, as well as numerous others.

Apparently more than one expert has serious concern, and expert opinions differ. Generally, reduction of gemsbok are not a concern because their numbers are stable or increasing and they primarily occupy lowland, grassland and scrub areas, which put them outside most of the area to be inhabited by reintroduced wolves. Neither is the primary range of the pronghorn, now limited in number, expected to overlap areas inhabited by wolves, and little predation of pronghorn is anticipated. In addition their far scarcer numbers leave them much less accessible than mule deer, which are expected to be the wolves' primary target. In contrast, bighorn sheep are natural prey of the Mexican wolf, and some believe reintroduction of wolves into the habitat of the chihuahuan desert

bighorn could potentially inflict great harm to already reduced populations. Others do not see bighorn sheep seriously affected by reintroduced wolves, again because they are low in number and not readily available. Similar evaluations, not always in agreement, were entered into the record with regard to numerous species found in the wolf recovery areas.

However many animals are studied, there is little consensus with regard to managing either environmental resources or threatened and endangered species. More often than not, immediate needs of the many varied species stand in opposition. Simply because FWS does not finally resolve difficult questions of conflicting conservation requirements, however, does not translate to a failure to consider the issues. "In reviewing the agency's determination, the reviewing court must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." Olenhouse v. Commodity Credit Corp., supra at 1574.

Plaintiffs once more fail to target an issue FWS neglected. In spite of the concerns raised by Plaintiffs and by the experts whose opinions are included in the administrative record, I find in the record that FWS appropriately considered scientific data and made a reasoned explanation for the decision to go forward with reintroduction of the wolf into the designated areas, even though these areas encompass substantial and identifiable quantities of other endangered and threatened species. The arbitrary and capricious standard of review limits a court's focus to the rationality of an agency's decision-making process rather than on the rationality of the actual decision. Id. Therefore, in spite of concerns Plaintiffs raise, I cannot say that FWS has acted in a manner so as to justify judicial intervention.

Likewise, I find the FEIS sufficiently complete and reasonable. An environmental impact statement must include all information which is relevant and essential to making a reasoned choice

from among alternatives. 40 C.F.R. sec. 1502.22. It must provide a "full and fair discussion" of the significant potential environmental impacts of the proposed action; and it must include a summary of existing, credible scientific evidence which is relevant to the subject. 40 C.F.R. sec. 1506.1; sec. 1502.22. The FEIS at issue does these things and it is not the purpose of judicial review to demand more. Id.

### 5. FWS Compliance with Public Comment and Consultation Requirements

Plaintiff provides additional reason for the court to reject both the FEIS in this case and the decision to release wolves in New Mexico. Plaintiff states that both fail to comply with statutory and regulatory provisions which mandate consultation and public comment. Again, I find Plaintiffs' assertions without support in the administrative record.

The FEIS includes an entire chapter on "Consultation and Coordination" and provides a lengthy list of state and federal agencies and organizations, tribal and county governments, business and private organizations, conservation groups and elected public officials included in the planning and information process. Prior to the Final Rule which precipitated the releases, FWS conducted widespread consultations and four public hearings, two in Tuscon, Arizona, one in Las Cruces, New Mexico, and one in Albuquerque, New Mexico. In addition to periodic meetings with federal, state and local agencies, FWS also consulted with numerous experts from outside the agency and with private landowners. Public participation included open house meetings and written comment periods following the public hearings. FWS received over 1300 written comments.

The administrative record indicates extensive public input by correspondence, public meetings to receive comments and provide information, periodic press releases and also newsletters informing the public of the status of FWS plans and the progress of wolf releases. The administrative record also

incorporates written cooperative agreements and memoranda of understanding between FWS and state agencies, tribal government and other federal agencies, for example, the Arizona Game and Fish Department, the New Mexico Department of Game and Fish, the White Mountain Apache Tribe, the San Carlos Apache Tribe, the United States Department of Agriculture, and the United States Department of Defense.

FWS's approach to estimating livestock depredations was first presented in its draft environmental impact statement. With a twenty-four month public comment period, this allowed for a maximum of input and criticism. FWS received and considered criticism. It also considered several very different estimates as to the amount of livestock depredation realistically anticipated. By its conclusions, the FEIS projects a depredation effect only in terms of a range, and although there is obviously a dramatic difference between a projection that 100 wolves will be responsible for one loss in a year's time and losses as high as 34 cattle annually, with most of these calves, the wide range in FWS projections is justifiable given the number of variables and the lack of prior data specific to Arizona and New Mexico. In any case, it cannot be said that as FWS made its ultimate decisions, public comment was not received and considered.

Plaintiffs contend, nevertheless, that before implementing a Final Rule and beginning to release wolves, FWS failed to consult with all interested parties or to consider the views of local livestock producers. FWS, Plaintiffs argue, did not attempt an agreement with private landowners who might be affected by establishment of an experimental wolf population in the area, even though the ESA mandates this kind of agreement. Further, Plaintiffs complain that the FEIS violates NEPA because it fails to discuss coordination with state and local governments, human health and safety, and impact on private property.

I find from the record that FWS did not neglect these aspects of a wolf recovery plan. Recognizing the historic animosity and understandable apprehension of farmers and ranchers to wolves, FWS understood the importance of keeping the local public informed and working with state and local officials and private landowners in an attempt to gain support for its proposals. It is possible that no amount of public hearings, consultations or dissemination of information could have produced local acceptance of FWS plans, short of taking wolf recovery areas completely away from Arizona and New Mexico. Plaintiffs fail to target issues either neglected by FWS or handled by Defendants in an arbitary or summary manner. I find the administrative record provides what the law requires and satisfies the test of reasonableness on the part of FWS.

## 6. Necessity of a Supplemental Impact Statement

Lastly, Plaintiffs argue that because of new information and materials, such as the wolf depredation studies from Spain and Italy which are presently available to FWS, but are not a part of the administrative record, FWS is obligated to provide a supplement to its FEIS. Plaintiff's demand, however, is not supported by case law. Marsh v. Oregon Natural Resources Council, supra at 373; Village of Los Ranchos de Albuquerque v. Marsh, supra.

A supplemental environmental impact statement is to be filed where there are "significant new circumstances or information relevant to environmental concerns bearing on the proposed action or its impacts." Marsh v. Oregon Natural Resources Council, supra at 372. Further, determinations with regard to what is to be considered "significant" belongs solely to agency. Id. These choices are not susceptible to judicial override unless the determination not to supplement is found to be arbitrary and capricious. Id.; Village of Los Ranchos de Albuquerque v. Marsh, supra. There is no other standard applicable. Id.; Olenhouse v. Commodity Credit Corp., supra. The case on which Plaintiffs rely to

argue for a supplemental statement has been explicitly overruled. Id. at 971.

Plaintiff does not argue that the decision not to supplement the FEIS is arbitrary and capricious, only that the supplement is reasonable and necessary. Obviously, Plaintiffs believe that in view of their additional data on livestock depredation *only one* rational decision is possible, and that decision is contrary to the one made by FWS. Yet, there may be times and situations when more than one choice must be deemed rational. In that circumstance, it is surely not the purpose of judicial review to dictate the choice; a judicial review can only determine whether the choice made by the executive agency has sufficient basis in fact. Olenhouse v. Commodity Credit Corp., supra. Nothing in the record in this case indicates that Defendants' refusal to provide a supplemental environmental statement is arbitrary. The decision is simply one of many with which Plaintiffs disagree. This is not enough for judicial intervention. Id. at 972.

### Conclusion

Plaintiffs' disagreements with Defendants, however strongly felt, are not enough to present legal impediment to what Defendants undertake. Neither Plaintiffs nor an extensive administrative record provide reason to overturn FWS decisions with regard to its wolf recovery plan and the release of wolves in Arizona and New Mexico. FWS has considered a substantial amount of pertinent data and made a reasoned decision. In developing its Final Rule for the wolf recovery program and for reintroduction of the Mexican wolf into areas of Arizona and New Mexico, FWS complied with the requirements of NEPA, the ESA and the APA. Nothing Plaintiffs argue convinces otherwise.

While many of the FWS decisions at issue were necessarily based on estimates and projections, FWS has collected and analyzed scientific data and what historical information is available and has included with it a broad spectrum of expert opinion. Without doubt, FWS has been confronted

with more than one opposing goal. It has dealt with its dilemmas in as reasonable and complete a manner as can be expected. Even though FWS cannot predict the final outcome of its wolf releases or the amount of livestock depredation to result, on the whole, Defendants and FWS have acted objectively on the basis of what appears to be reasonably sound projections and analyses. FWS has also articulated reasonable grounds for the choices made, and it has assembled an adminis-trative record which supports its actions.

Equally important, the FEIS expressly states an intention to condition captive wolves prior to release to the maximum extent possible, to release in remote portions of the recovery areas, and to monitor, evaluate and manage released wolves on a continuous basis. This management encom-passes removing wolves found to cause problems and allowances for the killing of wolves that attack domestic livestock, as well as for monetary compensation.

Some livestock depredation is inevitable. Considering the many other difficulties which face farmers and ranchers in the Southwest, I can only hope that the wolf recovery plan over the long term proves compatible with other imperatives and legitimate needs of the region and its people and that over time more than the one goal of government, recovery of the Mexican gray wolf, survives the present efforts with measurable success.


NOW, THEREFORE, IT IS ORDERED that the Plaintiffs' First Amended Complaint be dismissed with prejudice and judgment enter for Defendants.

_____
SENIOR UNITED STATES JUDGE